1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    TRAVIS COYLE,                          )    No. C 02-1810 SBA (pr)
                                            )
4              Plaintiff,                   )    **ORDER GRANTING**
                                            )    **DEFENDANTS' MOTION FOR**
5    v.                                     )    **SUMMARY JUDGMENT**
                                            )
     STEVEN CAMBRA, JR., et al.,            )
6                                           )
               Defendants.                  )    (Docket No. 31)
7    _____       )

8                                **INTRODUCTION**

9         Plaintiff, a California prisoner, filed this pro se civil rights complaint pursuant to 42

10   U.S.C. § 1983 against officials of Pelican Bay State Prison ("PBSP") for deliberate indifference

11   to Plaintiff's serious medical needs.

12        After an initial review of the complaint, the Court dismissed Plaintiff's complaint with

13   leave to amend.  The Court found that Plaintiff had stated a cognizable claim against Dr. Dwight

14   W. Winslow for deliberate indifference to Plaintiff's serious medical needs.  The Court also

15   found that Plaintiff had stated a cognizable claim for deliberate indifference against the director

16   of health care services for the California Department of Corrections ("CDC") and the health care

17   manager of PBSP.  Plaintiff, however, had not named those defendants in his original complaint,

18   therefore, the Court granted Plaintiff an opportunity to conduct discovery to identify them.

19        In his amended complaint filed on February 11, 2004, Plaintiff identified the unnamed

20   defendants -- the Deputy Director of Health Care Services[1] and the PBSP Heath Care Manager --

21   as Dr. Susann Steinberg and Dr. Winslow, respectively.  Therefore, the Court found that Plaintiff

22   stated a valid claim against Dr. Steinberg as well as against Dr. Winslow for deliberate

23   indifference to Plaintiff's serious medical needs.

24        The Court found that Plaintiff had not stated cognizable claims against the remaining

25   named defendants in his complaint, CDC Director Cambra and PBSP Warden Ayers.  Plaintiff

26

27        [1] Defendants indicate that the Plaintiff incorrectly used the title "Director of Health Care
     Services for CDC" for Dr. Steinberg.  The Court notes that her correct title is "Deputy Director of
28   Health Care Services for CDC."

*United States District Court*
For the Northern District of California

1  did not assert claims against these defendants in his amended complaint, therefore, Defendants

2  Cambra and Ayers were dismissed from this action.

3        The Court ordered the complaint served on Drs. Steinberg and Winslow ("Defendants").

4  Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs related

5  to the diagnosis and treatment of his chronic right knee pain caused by an alleged excessive delay

6  in receiving an orthopedic consultation.  Plaintiff seeks declaratory relief, nominal damages, and

7  punitive damages.

8        Defendants now move for summary judgment on the grounds that the undisputed facts

9  show that Defendants did not violate Plaintiff's rights under the Eighth Amendment, that Plaintiff

10  may not maintain a suit for equitable relief where there is a pending class action suit with the

11  same subject matter, and that Defendants are entitled to qualified immunity (docket no. 31).

12  Both an opposition (docket no. 37) and reply (docket no. 38) were filed by the parties.  For the

13  reasons discussed below, the Court GRANTS Defendants' motion for summary judgment.

**BACKGROUND**

15        In support of Defendants' motion for summary judgment, Defendants submit declarations

16  and documentary evidence.  The following facts are undisputed, unless otherwise noted.

17        Plaintiff was incarcerated at PBSP throughout the relevant time period.

18        On July 16, 1999, Plaintiff was examined by medical staff at PBSP for complaints of

19  grinding in his knees and pain.[2]  According to the medical record, Plaintiff was "observed

20  playing handball in the concrete yard" without "guarding of knees or limping or deformity seen."

21  (Defs.' Attach. A.)  It was determined that his condition had resolved with no further need for

22  additional care.  (Winslow Declaration in Supp. of Defs.' Mot. for Summ. J. ["Winslow Decl."] ¶

23  8.)

24        On July 22, 1999, Plaintiff was again examined by medical staff for similar knee

25  complaints.  The medical record stated that "[a]bout two months ago, [Plaintiff] noted 'grinding'

26  [in his] right knee."  (Defs.' Attach. B.)  The record stated that Plaintiff's left knee was normal

27

28        [2]  Plaintiff claims to have a "history of problems with his right knee going back to the
summer of 1999."  (Am. Compl. at 3.)

2

and his right knee had "no swelling or tenderness, normal range of motion."  (Id.)  Although the "medial and lateral ligaments seemed mildly lax," it was an essentially normal exam.  (Id.)  There was a recommendation for an Ace bandage for Plaintiff's right knee, x-rays of both knees and an orthopedic consultation.  (Id.)

On July 30, 1999, the x-ray report for both knees stated that the knees were normal. (Defs.' Attach. C.)  The report listed the findings for the right knee as: "[n]o bone joint or soft tissue abnormality is evident."  (Id.)

On September 29, 1999, Plaintiff was seen by Dr. Duncan[3] at the Orthopedic Specialty Clinic for "evaluation of pain, swelling and giving way in the right more so than the left knee." (Defs.' Attach. D.)  Dr. Duncan stated in his report: "[Plaintiff] initially sustained an injury to the right knee in a motor vehicle accident over ten years ago, and then reinjured the knee playing handball about five months ago and since that time has had daily activity related pain, crepitation swelling and occasional giving way."  (Id.)  Under the heading "Impression," Dr. Duncan stated that Plaintiff had bilateral knee pain with "mild cruciate insufficiency," and some evidence of "medial meniscus tear and patellofemoral cartilage injury."  Dr. Duncan's recommendation was for continued non-invasive treatment, and the avoidance of activities that would stress the knee. (Id.)  Plaintiff was to be provided with a right knee brace and would return in four weeks for re-evaluation of symptoms.  (Id.)

On October 7, 1999, Dr. Winslow authorized the issuance of a knee brace for Plaintiff, for one year.  (Winslow Decl. ¶ 12; Defs.' Attach. E.)

On October 27, 1999, there was a follow-up examination with Dr. Lau.  Dr. Lau's report stated that there was "full range of motion of the right knee," "no effusion or synovitis," "no crepitus," shift tests were negative, and the McMurray's test was negative.  (Defs.' Attach. F.) Under the heading "Impression," the report stated "patella chondromalacia" of the right knee.  A

_____

[3]  Drs. Duncan and Lau are orthopedic specialists in private practice, under contract with the Department of Corrections to provide orthopedic medical care to the inmates.

3

recommendation was made for physical therapy and for arthroscopy[4] if there was no improvement.  (Id.)

Following the recommendation of Dr. Lau, Plaintiff had physical therapy on November 9, 12, 16, and 19, 1999.  Also, Plaintiff was prescribed Motrin for ninety days.  (Winslow Decl. ¶ 14.)

On January 11, 2000, Plaintiff was examined by the PBSP medical staff for his on-going knee pain.  The examination progress notes for that date stated that there was "no crepitus heard," his gait was steady, no limp was visible after stair climbing, there was no swelling, and the muscles in the upper legs were very well developed.  Plaintiff was prescribed Ibuprofen.  (Id. ¶ 15.)

On January 23, 2000, the staff again examined Plaintiff, his prescription for Motrin was changed to Naprosyn for ninety days, and the doctor ordered that Plaintiff re-start physical therapy.  (Id. ¶ 16.)

On March 9, 2000, Plaintiff was seen for a follow-up appointment when he requested an orthopedic consultation.  The examination progress notes stated that there was good range of motion for bilateral knees, without popping or "crepitus," good alignment, and no limp seen.  (Id. ¶ 17.)

On March 14, 2000, a follow-up with a staff doctor made an assessment of possible internal derangement.  The recommendation was to continue the Naprosyn and for an elastic knee immobilizer.  On March 20, 2000, Dr. Winslow authorized the elastic immobilizer for a duration of six months.  (Id. ¶ 18.)

On July 17, 2000, Plaintiff was examined by the medical staff.[5]  (Defs.' Attach. K.)  The progress notes stated that Plaintiff injured his right knee a year ago, his medicines ran out two

---

[4]  Arthroscopy is the visual examination of the interior of the knee with a special surgical instrument.

[5]  Plaintiff alleges that his right knee "blew out on him" in July 2000.  (Am. Compl. at 3.)

United States District Court
For the Northern District of California

months ago, and his chrono[6] for his ace wrap and brace ended in August.  (Id.)  The impressions were "slight swelling noted in right knee . . . no knee brace present."  (Id.)  Plaintiff was referred for a follow-up with the staff medical doctor.  (Id.)

On July 20, 2000, the staff medical doctor's recommendation was for an orthopedic consultation.  Again, Ibuprofen was prescribed for ninety days.  (Winslow Decl. ¶ 20.)

On July 25, 2000, the request for the orthopedic consultation was authorized.  (Id. ¶ 21.)

On October 22, 2000, Plaintiff filed a prison grievance asking to be seen by a specialist. (Pl.'s Ex. F at 2.)  On November 9, 2000, he received an informal response explaining that he was still on the referral list for an orthopedic consultation, but "we do not have a contract with the orthopedist[s] who come to PBSP at the present time."[7]  However, within two weeks of November 9, 2000, Plaintiff was told he would be seen by a specialist through Telemedicine.[8] (Id.)

There was a follow-up appointment with the medical staff on October 27, 2000, during the time Plaintiff was waiting for his medical consultation.  Additionally, Plaintiff was receiving pain medication and the use of his elastic immobilizer.  (Winslow Decl. ¶ 22; Defs.' Attach. M.)

Plaintiff resubmitted his appeal on November 14, 2000, objecting that a Telemedicine interview was inadequate and questioning why the prison did not cover the time period of when the orthopedists' contract was under renegotiation.  (Pl.'s Ex. F at 2.)  He specifically asked that the grievance be expedited because he was in pain.

On November 20, 2000, Plaintiff was examined by Dr. Sankus, a staff medical doctor. Dr. Sankus's progress notes stated that when Plaintiff was walking, he was hyper-extending his

---

[6]  A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed necessary by medical staff.

[7]  Plaintiff later learned that for some period of time late in 2000, the prison was renegotiating its contract with the orthopedists, and no orthopedic specialists were available until the negotiations were settled.  (Am. Compl. at 4.)

[8]  Telemedicine is a live video conference with private medical specialists, the inmate and staff doctors.  (Defs.' Mot. for Summ. J. at 10.)  "It is an acceptable medical practice that substitutes for a consultation with a specialty clinic doctor, particularly when the inmate has been seen several times by the specialty clinic doctor for a continuing medical condition as in the case of [Plaintiff]." (Winslow Decl. ¶ 6.)

right knee, however, there was no weakness in the ligaments.  Dr. Sankus's assessment was probable cartilage damage or ligament damage.  The plan at that time was to treat Plaintiff with Naprosyn and await the Telemedicine conference scheduled for the following day.  (Winslow Decl. ¶ 24; Defs.' Attach. O.)  However, Plaintiff's Telemedicine conference never took place. (Defs.' Attach. P.)

It appears from the grievance form, that the first-level appeal was received by prison officials and that on November 29, 2000, it was sent directly for second-level review by Dr. Winslow (bypassing the first formal level of review).  (Pl.'s Ex. F at 2.)  The Orthopedic Specialty Clinic had resumed seeing inmates on that same date, November 29, 2000, when the orthopedists' contract was settled and orthopedists were once again available for consultations. (Winslow Decl. ¶ 5.)

On January 8, 2001, Plaintiff was examined by Dr. Sankus.  According to Dr. Sankus's progress notes, Plaintiff stated that "[his] knee gave out on Thursday."[9]  (Defs.' Attach. O.)  He also noted that Plaintiff "walks with a significant limp on his knee and seems to have significant real problems with walking."  (Defs.' Attach. P.)  Furthermore, Dr. Sankus notes stated, "[h]e is tender over the area of the right knee."  (Id.)  Dr. Sankus further explained that a Telemedicine conference scheduled for November 21, 2000 did it not take place, possibly because the schedule was full.  (Id.)  Dr. Sankus talked to the Orthopedic Specialty Clinic to follow-up on the scheduled appointment, which was confirmed for February 2001.  (Id.)  Further, because the Naprosyn medication was not helping, it was changed to Indocin. (Id.)

---

[9]  Plaintiff alleges that his right knee "blew out again" in January 2001. (Am. Compl. at 4.) Plaintiff states that he was seen by the medical staff on January 5, 2001 and submits the "Physician's Progress Notes" from that visit.  (Pl.'s Decl. in Opp. to Defs.' Mot. for Summ. J. ["Pl.'s Opp'n"] at 2; Ex. B.)  However, Defendants attached the same exhibit and noted the date of the visit was "November 5, 2000."  (Winslow Decl. ¶ 23, Defs.' Attach. N.)  The Court is unclear as to the exact date of this document; the month is crossed out, and the year is hard to decipher.

Nevertheless, the progress notes reveal that Plaintiff was seen by the medical staff and Plaintiff stated that "[he] was in the yard yesterday [and] 1 ½ hrs. back in his house, he felt his knee give out."  (Id.)  Plaintiff stated that he had submitted a sick-call slip to be seen; however, the sick-call slip was not located.  (Id.)  The medical technical assistant noted Plaintiff's "unsteady gait," tender knee, and some swelling.  (Id.)  Plaintiff was directed to take his medication, use ice as needed, and to elevate his leg.  (Id.)  He was told no exercising, and to have bed rest over the weekend until he could see a medical doctor.  (Id.)

6

On January 10, 2001, Plaintiff was seen by the medical staff.  The progress notes stated that Plaintiff's knee gave out the previous Thursday and that he had seen a staff doctor on Monday, January 5, 2001.  The medical staff examined the right knee and noted that there was minimum swelling without bruising or evidence of trauma.  Again, the specialty clinic was called to confirm the scheduled appointment.  (Winslow Decl. ¶ 26; Defs.' Attach. Q, Q-1.)

On January 24, 2001, Plaintiff received his orthopedic consultation and was examined by Dr. Lau at the Orthopedic Specialty Clinic.  Dr. Lau's impression was "patellofemoral chondromalacia" of the right knee.  Dr. Lau's recommendation was for an MRI study.  There was an authorization for a follow-up appointment with the medical staff in two weeks.  (Winslow Decl. ¶ 27.)

The MRI was performed at Sutter Coast Hospital on March 2, 2001.  The radiology report by Dr. Robert Tambeaux stated, "Plaintiff had a medial compartment contusion involving medial tibial plateau and medial femoral condyl."  (Defs.' Attach. S.)  There was no evidence of "meniscal" or "ligamentous" injury.  (Id. )

Dr. Winslow issued a second-level response to Plaintiff's grievance on March 7, 2001.  (Pl.'s Ex. F at 15-16; Defs.' Attach. JJ.)  He "partially granted" the grievance because by that date Plaintiff had already received his orthopedic consultation.[10]  (Id.)

On March 16, 2001, Plaintiff was seen by Dr. Sankus and the medical staff.  Dr. Sankus reviewed the MRI and noted the findings of medial compartment contusion.  He stated that Plaintiff was better although not significantly improved.  The plan was to have another orthopedic consultation.  (Winslow Decl. ¶ 29.)

On April 9 and 13, 2001, there were follow-up appointments with the medical staff and Dr. Sankus.  The progress notes stated that the knee was not swollen and flexibility was good.  Dr. Sankus noted that the knee was not hyper-extended, there was no ligament damage, the patella was soft, and there was no fluid.  Dr. Sankus's plan was for a follow-up with the speciality clinic.  (Id. ¶ 30.)

---

[10]  At the third formal level of review, the grievance was denied because by that date, October 5, 2001, Plaintiff had received appropriate medical services.  (Pl.'s Ex. F at 18-21.)

7

**United States District Court**
For the Northern District of California

On May 2, 2001, Plaintiff was again examined by Dr. Lau at the Orthopedic Specialty Clinic. The examination revealed a full range of motion, no "synovitis" or "effusion," the ligaments were stable, the McMurray's test was negative, and the knee contusion was healing. Dr. Lau's plan was to refer Plaintiff to physical therapy for knee strengthening exercises. There was no indication for any operation, and no return appointment was made. (Id. ¶ 31.)

On May 16, 2001, Plaintiff was examined by Dr. Sankus. At that time it was noted that Plaintiff was not having difficulty walking, and his right knee was stable without tenderness. Dr. Sankus's plan was to follow-up after physical therapy was completed as recommended by Dr. Lau. (Id. ¶ 32.)

On July 3, 2001, Plaintiff was examined again by Dr. Sankus at the Orthopedic Specialty Clinic. The progress notes stated that there was no edema or swelling. Further, Plaintiff was to begin a series of physical therapy sessions at Crescent City Physical Therapy. The physical therapy sessions were on July 10, 12, 17, and 19, 2001. (Id. ¶ 33.)

On August 1, 2001, there was a follow-up exam with Dr. Duncan. The examination report stated there was full range of motion and the ligamentous exam was intact, and there was some mild popping in the tibial femoral joint at the lateral aspect. His notes under the heading, "Impression," stated knee pain with history of bone bruise. Dr. Duncan's plan was to continue physical therapy rather than any surgical intervention because the MRI and the clinical evidence did not suggest ligamentous or meniscal pathology. On that same date, Dr. Winslow authorized an elastic knee brace for one year as recommended by Dr. Duncan. Again, Dr. Duncan prescribed physical therapy to strengthen Plaintiff's knee. (Id. ¶ 34.)

On August 2, 2001, before the completion of the recommended physical therapy, Plaintiff was examined by the medical staff for lower back pain. This was a recurrence from a problem Plaintiff had three years earlier. On August 8, 2001, Dr. Sankus prescribed Robaxin and ordered x-rays for the lower back, which were done on August 13, 2001. (Id. ¶¶ 35, 36.)

On August 15 and 28, 2001 and on September 11, 2001, Plaintiff was examined by Dr. Sankus. Plaintiff was still having continuing problems with his lower back. His lower back and right knee were examined. Dr. Sankus's plan was to have the physical therapy for the knee and

8

United States District Court

For the Northern District of California

order an MRI of the lower back.  (Id. ¶¶ 37, 39.)  The MRI of the lower back was completed on September 28, 2001. (Defs.' Attach. EE.)

Physical therapy for the right knee occurred on October 11, 16, 18, 23, 25, and 30, 2001 and on November 1 and 6, 2001.  (Winslow Decl. ¶ 41.)

On October 24, 2001, Plaintiff was examined again by Dr. Sankus for his lower back.  In his progress notes, he stated that Plaintiff walked with a slight limp on his right leg.  Dr. Sankus's plan was for an orthopedic consultation and possible steroid injections for the lower back.  (Id. ¶ 42.)

Throughout 2002, a review of the medical records indicates that the focus of medical care was directed to Plaintiff's lower back.  The medical care included visits to the Orthopedic Specialty Clinic, a neurological consultation, a series of three epidural steroid injections, and physical therapy.  (Id. ¶ 43.)

## DISCUSSION

**I.    Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . .  since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits, which demonstrate the absence of a genuine issue of material fact.  See id. at 323.  When the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.  Then, the nonmoving party must set forth specific facts showing

the existence of a genuine issue of material fact.  Id. at 324.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See TW Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence and the inferences to be drawn therefrom must be viewed in a light most favorable to the nonmoving party.  See id. at 631.

It is not the task of the district court to scour the record in search of a genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment.  Id.  If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party.  See id.; see, e.g., Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence).  Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so.  Id. at 1029.  "The district court need not examine the entire file for evidence establishing a genuine issue of fact."  Id. at 1031.

## II.    Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs by not providing adequate, timely, and necessary specialist medical care for Plaintiff's right knee. At the time of filing his complaint, Plaintiff claims that he continues to suffer looseness and pain in his right knee.  He wears a brace and ace wrap on his knee, but still walks with a pronounced limp.  He still needs pain medication.  Plaintiff further alleges that even if he was referred for an orthopedic consultation in July 2000, Defendants knew that there would be no orthopedic specialists available for a period of time, due to contract renegotiations.  Therefore, he alleges that Defendants were deliberately indifferent to his serious medical needs because they were responsible for the over six-month delay in Plaintiff receiving his orthopedic consultation.

Defendants contend that (1) they were not aware of the existence of Plaintiff's serious

10

**United States District Court**
For the Northern District of California

1    medical needs, and (2) they were in no way responsible for the excessive delay in Plaintiff

2    receiving an orthopedic consultation.  Furthermore, they allege that the treatment Plaintiff

3    received was reasonable under the circumstances, because he was seen numerous times by

4    medical staff between July 2000 and 2002.

5         Deliberate indifference to serious medical needs violates the Eighth Amendment's

6    prohibition against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104

7    (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by

8    WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  The analysis

9    of a claim of "deliberate indifference" to serious medical needs involves an examination of two

10   elements: (1) the existence of a prisoner's serious medical needs and (2) the establishment of a

11   deliberately indifferent response by Defendants to those needs.  McGuckin, 974 F.2d at 1059.

12        A serious medical need exists if the failure to treat a prisoner's condition could result in

13   further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle,

14   429 U.S. at 104).  The existence of an injury that a reasonable doctor or patient would find

15   important and worthy of comment or treatment; the presence of a medical condition that

16   significantly affects an individual's daily activities; or the existence of chronic and substantial

17   pain are examples of indications that a prisoner has a serious need for medical treatment.  Id. at

18   1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

19        A prison official is deliberately indifferent if he or she knows that a prisoner faces a

20   substantial risk of serious harm and disregards that risk by failing to take reasonable steps to

21   abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not only "be

22   aware of facts from which the inference could be drawn that a substantial risk of serious harm

23   exists," but he "must also draw the inference."  Id.  If a prison official should have been aware of

24   the risk, but was not, then the official has not violated the Eighth Amendment, no matter how

25   severe the risk.  Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002).

26        In order for deliberate indifference to be established, there must be a purposeful act or

27   failure to act on the part of the defendant and a resulting harm.  McGuckin, 974 F.2d at 1060;

28   Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  Such

**United States District Court**
For the Northern District of California

1   indifference may appear when prison officials deny, delay or intentionally interfere with medical

2   treatment, or it may be shown in the way in which prison officials provide medical care.  See

3   McGuckin, 974, F.2d at 1062.  However, mere negligence or harassment related to medical

4   problems is not enough to make out a violation of the Eighth Amendment.  See Franklin v.

5   Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981); see also Toguchi v. Chung, 391 F.3d 1051, 1060-

6   61 (9th Cir. 2004).  Similarly, a showing of nothing more than a difference of medical opinion as

7   to the need to pursue one course of treatment over another is insufficient, as a matter of law, to

8   establish deliberate indifference.  See Franklin, 662 F.2d at 1344; see also Toguchi, 391 F.3d at

9   1059-60; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Mayfield v. Craven, 433 F.2d 873,

10  874 (9th Cir. 1970).  In order to prevail on a claim involving choices between alternative courses

11  of treatment, a plaintiff must show that the course of treatment the doctors chose was medically

12  unacceptable under the circumstances and that they chose this course in conscious disregard of

13  an excessive risk to the plaintiff's health.  See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh,

14  90 F.3d 330, 332 (9th Cir. 1996) (citing Farmer, 551 U.S. at 837), cert. denied, 519 U.S. 1029

15  (1996).

16        **A.**      **Dr. Winslow**

17        Defendants have submitted declarations and the pertinent portions of Plaintiff's medical

18  file.  According to these documents, Plaintiff was examined for his on-going knee pain by PSBP

19  medical staff on several occasions in 2000, before the staff doctor recommended that Plaintiff

20  consult an orthopedic specialist.  On July 25, 2000, Plaintiff's request for an orthopedic

21  consultation was authorized.  Plaintiff did not receive his orthopedic consultation until January

22  24, 2001.  Plaintiff received orthopedic care and physical therapy throughout the rest of 2001 and

23  2002.

24        **1.**      **The Existence of Plaintiff's Serious Medical Needs**

25        Dr. Winslow states that Plaintiff was not in need of emergency care, and that Plaintiff's

26  complaints of on-going knee pain could not automatically be construed to mean that there was a

27  substantial risk that his knee was seriously injured and in need of an immediate orthopedic

28  consultation.  Dr. Winslow presents evidence that Plaintiff's July 30, 1999 x-ray reports were

**United States District Court**
For the Northern District of California

1 | normal for both knees.  At all times, there were alternative means of receiving treatment for

2 | emergency medical care, however, Dr. Winslow contends that Plaintiff was not in need of

3 | emergency care.  The March 2, 2001 MRI report confirmed that Plaintiff's medical condition was

4 | such that he did not need surgery.  (Winslow Decl. ¶¶ 28, 44, 31, 34.)  Therefore, Dr. Winslow is

5 | of the opinion that Plaintiff was not seriously injured and was being adequately treated.  (Id. ¶¶

6 | 44, 48.)

7 |      Plaintiff presents no evidence indicating that Dr. Winslow knew that Plaintiff's knee was

8 | in need of emergency care or that Dr. Winslow knew that there was a substantial risk of serious

9 | harm if Plaintiff did not receive his orthopedic consultation immediately.  Even assuming

10 | Plaintiff told the medical staff that his "knee blew out on him" in July 2000 and January 2001,

11 | Dr. Winslow is not required to simply accept Plaintiff's lay self-diagnosis.  See Franklin, 662

12 | F.2d at 1344 ("A difference of opinion between a prisoner-patient and prison medical authorities

13 | regarding treatment does not give rise to a § 1983 claim.").  Rather than base his diagnosis on the

14 | opinion of a prisoner-patient, Dr. Winslow based his medical opinion on the facts then available

15 | to him, including the evidence that Plaintiff's x-rays were normal.  Therefore, there is no

16 | evidence that Dr. Winslow knew that Plaintiff had a serious medical need for an immediate

17 | orthopedic consultation.

18 |          **2.**      **The Establishment of a Deliberately Indifferent Response by**

19 |                   **Dr. Winslow to Plaintiff's Serious Medical Needs**

20 |      Even if Dr. Winslow knew of the existence of Plaintiff's serious medical needs,  Dr.

21 | Winslow was deliberately indifferent only if he knew that Plaintiff was facing a substantial risk

22 | of serious harm and then disregarded that risk by failing to take reasonable steps to abate it.  See

23 | Farmer, 511 U.S. at 837.

24 |      Plaintiff alleges that Dr. Winslow acted with deliberate indifference because he knew that

25 | there would be no orthopedic specialists available for a period of time, due to contract

26 | renegotiations.  Dr. Winslow acknowledges that "there was an eight-week suspension of the

27 |

28 |

13

**United States District Court**
For the Northern District of California

Orthopedic Specialty Clinic during contract negotiations,"[11] but he notes that "there was Telemedicine as an alternative means of seeing a specialist." (Defs.' Mot. for Summ. J. at 11.) That Plaintiff's orthopedic consultation was delayed for six months, however, does not automatically mean Dr. Winslow was deliberately indifferent. Plaintiff fails to show any evidence that Dr. Winslow acted with deliberate indifference in violation of Plaintiff's Eighth Amendment rights because he fails to raise triable issues of material fact that: (1) Dr. Winslow knew that there was an excessive delay in Plaintiff receiving an orthopedic consultation; (2) Dr. Winslow was responsible in his supervisory capacity for this delay; (3) Dr. Winslow knew that Plaintiff's knee required emergency treatment, or that there was a substantial risk that Plaintiff's condition would worsen without receiving an immediate orthopedic consultation; and (4) that Plaintiff's complaints of knee pain during the six-month delay required any further treatment than what he received from the medical staff.

Dr. Winslow holds the title of "Heath Care Manager," and is responsible for the administration of health care to inmates at PBSP. The record shows that Dr. Winslow was not aware, at the time Plaintiff filed his inmate appeal, of any delay in Plaintiff receiving an orthopedic consultation.[12] In his declaration, Dr. Winslow states:

> I only became aware that Mr. Coyle was waiting for his specialty clinic appointment when I received correspondence from him in January 2001. Further, I was not aware that Mr. Coyle had missed his Telemedicine appointment on November 21, 2000. When I received his correspondence on January 22, 2001, I responded to him by letter dated March 2, 2001.

(Winslow Decl. ¶ 47, citing to Defs.' Attach. II, II-1.) In his letter to Plaintiff dated March 2, 2001, Dr. Winslow stated:

> I have reviewed your health record, and as you are aware, you have been seen by the orthopedic surgeon for specialty consultation regarding your knee. This was done on January 24, 2001. An MRI Scan of your knee has been ordered to assist the physician in better determining what treatment is indicated.

---

[11]   The Orthopedic Specialty Clinic suspended appointments for PBSP inmates during the period from October 4, 2000 and when it resumed seeing PBSP inmates on November 29, 2000. (Winslow Decl. ¶ 5.)

[12]   The Court notes that the Orthopedic Specialty Clinic had resumed seeing inmates on November 29, 2000, which was on the same date that Plaintiff's inmate appeal was forwarded by M. J. Nimrod to Dr. Winslow for the second level review. (Winslow Decl. ¶¶ 5, 44, 47; Pl.'s Ex. F at 9.)

14

**United States District Court**
For the Northern District of California

1   (Defs.' Attach. II.)  Therefore, Plaintiff has failed to raise a triable issue of fact that Dr. Winslow

2   knew that there was a delay in Plaintiff receiving an orthopedic consultation.

3       Additionally, the record shows that Dr. Winslow was not responsible for the delay in

4   scheduling Plaintiff's orthopedic consultation.  Dr. Winslow did not schedule appointments for

5   the specialty clinics or Telemedicine; instead, he relied on his staff, including the Utilization

6   Management Nurse.  (Winslow Decl. ¶ 47.)  Therefore, if Plaintiff is alleging that Dr. Winslow

7   was deliberately indifferent to his serious medical needs by failing to schedule a timely

8   orthopedic consultation, then Dr. Winslow is being sued under his supervisory capacity.

9       A supervisor may be liable under section 1983 upon a showing of (1) personal

10  involvement in the constitutional deprivation or (2) a sufficient causal connection between the

11  supervisor's wrongful conduct and the constitutional violation.  Redman v. County of San Diego,

12  942 F.2d 1435, 1446 (9th Cir. 1991) (en banc) (citation omitted).  A supervisor therefore

13  generally "is only liable for constitutional violations of his subordinates if the supervisor

14  participated in or directed the violations, or knew of the violations and failed to act to prevent

15  them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

16      Plaintiff alleges that there was a delay of over six months before he received his

17  orthopedic consultation.  Prison officials may exhibit deliberate indifference by delaying

18  necessary medical treatment.  McGuckin, 974 F.2d at 1060, 1062.  Even if the delay in Plaintiff

19  receiving a orthopedic consultation amounted to a constitutional violation, there is nothing in the

20  record which shows that Dr. Winslow "participated in or directed the violations, or knew of the

21  violations and failed to act to prevent them."  See Taylor, 880 F.2d at 1045.

22      As an initial matter, Plaintiff has presented no evidence that Dr. Winslow was responsible

23  for this delay.  See Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to

24  summary judgment where plaintiff presented no evidence that delays between plaintiff's initial

25  visit, diagnosis and visit to the specialist were within the doctor's control).  Dr. Winslow's

26  declaration states that he does not handle the scheduling of appointments with speciality clinics

27  and Telemedicine.  Furthermore, Dr. Winslow claims he is not responsible for contracting with

28  specialists because that service is provided by the CDC's Office of Contract Services.  Therefore,

1    Plaintiff has failed to raise a triable issue of fact that Dr. Winslow was responsible for this delay.

2

3        Even if Dr. Winslow was responsible for scheduling Plaintiff's appointments with

4    specialists, the delay in providing his orthopedic consultation was not deliberate indifference in

5    the circumstances of this case because no substantial harm resulted, and the treatment Plaintiff

6    received was reasonable.  See Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990) (delay

7    of over one month in referring inmate to orthopedic specialist for removal of broken,

8    free-floating pin in shoulder, during which time inmate complained of pain in shoulder, was not

9    actionable because no substantial harm resulted); cf. Shapley v. Nevada Bd. of State Prison

10   Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (delay of one year in providing knee surgery for

11   inmate, resulting in serious aggravation of injury and permanent impairment, may be actionable).

12   Although Plaintiff alleges that Defendants were responsible for the excessive delay in receiving

13   his orthopedic consultation, Plaintiff has failed to show that this delay resulted in substantial

14   harm.  Had Dr. Winslow known that Plaintiff's knee required emergency treatment, or that there

15   was a substantial risk that Plaintiff's knee condition would worsen without receiving an

16   immediate orthopedic consultation, such a delay might well deliberately indifferent.

17       Plaintiff presents no evidence that his complaints of knee pain during the six-month delay

18   necessitated any further treatment than what he received from PBSP medical staff.  Plaintiff

19   points to his March 2, 2001 MRI, which he claims showed "significant bruising."  (Pl.'s Opp'n at

20   4.)  However, the radiology report by Dr. Tambeaux states, "[n]o evidence of meniscal or

21   ligamentous injury."  (Defs.' Attach. S.)  Defendants argue that Dr. Tambeaux's impressions

22   meant that the "MRI did not support any need of surgical intervention."  (Reply to Pl.'s Opp'n at

23   4.)  Plaintiff's medical records clearly establish that Plaintiff was cared for by PBSP medical

24   staff, who constantly monitored his complaints of knee pain and provided appropriate care.

25   Plaintiff also argues that the course of treatment made available to him (i.e., pain medication,

26   knee brace) was unacceptable.[13]  (Pl.'s Opp'n at 4.)  In order to prevail on a claim involving

27

28       [13]  Plaintiff also claims that his knee brace was taken from him by the PBSP housing staff in
     September 2000, because he no longer had a valid chrono allowing for it.  (Pl.'s Opp'n at 2.)

_United States District Court_
For the Northern District of California

16

choices between alternative courses of treatment, Plaintiff must show that the course of treatment was medically unacceptable under the circumstances and the course was chosen in conscious disregard of an excessive risk to Plaintiff's health.  See Toguchi, 391 F.3d at 1058.  The Court has already  determined that Dr. Winslow was not aware that Plaintiff's knee required emergency treatment, or that there was a substantial risk that Plaintiff's knee condition would worsen without receiving an immediate orthopedic consultation.  See supra Part II.A.1.  Furthermore, the record shows that Plaintiff was never denied medical care during the six months that he was waiting for his orthopedic consultation.  He was seen by the medical staff on October 27, 2000, November 20, 2000, January 8, 2001 and January 10, 2001 for his complaints of knee pain.  During these visits, Plaintiff was given pain medication.  When Plaintiff complained that the current medication was not working, he was prescribed another type of medication.  On November 20, 2000, the progress notes stated that Dr. Sankus examined Plaintiff's right knee and "could not demonstrate any weakness to the ligaments at this particular time." (Defs.' Attach. O.)  Upon making the assessment that there could be "probable" cartilage or ligament damage, Dr. Sankus gave him pain medication and noted that Plaintiff was scheduled for a Telemedicine conference the next day.[14]  During his two visits with the medical staff in January 2001, Plaintiff complained that his knee gave way in early January.  The medical staff prescribed the necessary pain medication and immediately followed-up his scheduled orthopedic consultation in order to confirm it.  The progress notes during his visits during the six-month delay show that Plaintiff did not suffer any further substantial or permanent injury to his knee, and that he was given constant care by the medical staff.  Therefore, the course of treatment was medically acceptable under these circumstances and not chosen in conscious disregard of an excessive risk to Plaintiff's health.  Plaintiff has failed to raise a triable issue of fact that his complaints of knee

---

[14]  The Court notes that the record shows that Plaintiff's Telemedicine conference never took place. (Defs.' Attach. P.)  However, Plaintiff's claims against Defendants only involve the allegation that they were deliberately indifferent to his serious medical needs by delaying his orthopedic consultation.  Furthermore, Plaintiff objected to the Telemedicine interview because he said it was "inadequate." (Pl.'s Ex. F at 2.)  Therefore, the Court need not further discuss the effect of the Telemedicine conference never taking place in its analysis of Plaintiff's deliberate indifference claim.

United States District Court

For the Northern District of California

1    pain during the six-month delay necessitated any further treatment than what he received.

2        In sum, there is no dispute that there was a delay in Plaintiff receiving his orthopedic

3    consultation.  However, Plaintiff has not created a genuine issue of disputed fact that Dr.

4    Winslow knew of the existence of Plaintiff's serious medical need.  Plaintiff has also not created

5    a genuine issue of disputed fact that Dr. Winslow knew about or was responsible for the delay in

6    Plaintiff receiving his orthopedic consultation.  Finally, there is no genuine issue of disputed fact

7    that Dr. Winslow knew that Plaintiff's knee required emergency treatment, or that there was a

8    substantial risk that Plaintiff's condition would worsen without receiving an immediate

9    orthopedic consultation, or that Plaintiff's complaints of knee pain during the six-month delay

10   necessitated any further treatment than what he received from PBSP medical staff.

11   Consequently, there is no genuine dispute of material fact as to whether Dr. Winslow acted with

12   deliberate indifference to Plaintiff's serious medical needs by delaying his orthopedic

13   consultation.

14       The Court has considered the materials submitted in support of and in opposition to

15   summary judgment and concludes that, even when the Court views all facts in the light most

16   favorable to Plaintiff, no reasonably jury could return a verdict for him and against Dr. Winslow.

17   Accordingly, Dr. Winslow's motion for summary judgment as to the deliberate indifference claim

18   is GRANTED.

19       **B.    Dr. Steinberg**

20       Plaintiff alleges that Dr. Steinberg acted with deliberate indifference to his serious

21   medical needs because she failed to prevent the delay in Plaintiff receiving his orthopedic

22   consultation.

23       Plaintiff fails to show any evidence that Dr. Steinberg acted with deliberate indifference

24   in violation of Plaintiff's Eighth Amendment rights because there are no triable issues of fact that

25   Dr. Steinberg knew of the existence of Plaintiff's serious medical needs, or that she was even

26   aware that there was a delay in Plaintiff receiving his orthopedic consultation.

27       At the relevant time of this instant action, Dr. Steinberg was the Deputy Director of

28   Health Care Services Division for CDC, and her office was in Sacramento, California.

United States District Court

For the Northern District of California

18

(Steinberg Declaration in Supp. of Defs.' Mot. for Summ. J. ["Steinberg Decl."] ¶ 1.)  Dr. Steinberg claims that she was not responsible for the negotiations or contracting with Drs. Duncan and Lau, or any other orthopedic specialists.  This administrative function was the responsibility of a separate CDC Division, Institutional Contract Services.  She was not aware of any interruption in renewing Drs. Duncan and Lau's contract.  (Steinberg Decl. ¶¶ 3, 5, 6.)  Therefore, Dr. Steinberg, just like Dr. Winslow, is being sued in her supervisory capacity because she had no direct involvement with the negotiations or with contracting orthopedic specialists.

The record shows that Dr. Steinberg was not aware of Plaintiff's serious medical needs or that there was a delay in Plaintiff's orthopedic consultation.  (Id. ¶ 6.)  In her declaration, Dr. Steinberg states:

> I was not aware of Mr. Coyle's alleged delay in receiving medical care at PBSP. The contract documents I reviewed . . . would suggest that there was back-up medical emergency care available during the approval process of the contract with Drs. Duncan and Lau.  I was not responsible nor did I sign off on or approve their contract.

(Id.)  Even if the delay in Plaintiff receiving his orthopedic consultation amounted to a constitutional violation, there is nothing in the record which shows that Dr. Steinberg "participated in or directed the violations, or knew of the violations and failed to act to prevent them."  See Taylor, 880 F.2d at 1045.  Therefore, Plaintiff has not presented evidence to support the inference that Plaintiff's delay in receiving his orthopedic consultation was because of Dr. Steinberg's deliberate indifference to Plaintiff's serious medical needs.

Even viewing the evidence and the inferences drawn therefrom in the light most favorable to Plaintiff, no reasonable jury could return a verdict for Plaintiff against Dr. Steinberg. Accordingly, Dr. Steinberg's motion for summary judgment as to the deliberate indifference claim is GRANTED.

**III.    Equitable Relief**

Plaintiff requests equitable relief in his Amended Complaint.   However, Plaintiff's action for equitable relief from alleged unconstitutional prison conditions cannot be maintained where there is a pending class action suit involving the same subject matter, but instead must be made

through the class representative in the class-action suit.  See McNeil v. Guthrie, 945 F.2d 1163,

1165 (10th Cir. 1991); see also Gillespie v. Crawford, 858 F.2d 1101, 1103 (5th Cir. 1988) (en

banc).

    The Court finds that there is currently a class action suit involving inmates at PBSP,

including medical care, Madrid v. Gomez, No. C 90-3094 THE (N.D. Cal. filed Oct. 26, 1990).[15]

Claims for equitable relief must be brought through the class representative until the class action

is over.  McNiel, 945 F.2d at 1166.  Since Plaintiff raises claims for injunctive relief pending in

the above-cited class action suit, his claims are barred and are accordingly DISMISSED.

**IV.    Qualified Immunity**

    Defendants claim that summary judgment is proper in this case because they are entitled

to qualified immunity from liability from civil damages.[16]

    The defense of qualified immunity protects "government officials . . . from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982).  The rule of qualified immunity "'provides ample protection to all but

the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478,

495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

    In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a particular

sequence of questions to be considered in determining whether qualified immunity exists.  A

qualified immunity analysis must begin with this threshold question: based upon the facts taken

---

[15]  The plaintiffs in Madrid represent a class of all prisoners who are, or will be, incarcerated by the State of California at PBSP.  They challenged the constitutionality of a broad range of conditions and practices that intimately affect almost every facet of prison life at PBSP.  In particular, plaintiffs claimed that defendants failed to provide inmates with adequate medical care.  Plaintiffs sought redress in the form of declaratory and injunctive relief only, i.e. there is no claim for damages.
    Following a bench trial, the court found that many of the defendants' practices violated the plaintiffs' constitutional rights, and ordered the parties to work with a Special Master to develop a remedial plan.  See Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995).  Several remedial orders have followed; however, no final order of judgment has yet been entered in Madrid.

[16]  Plaintiff did not address qualified immunity in his opposition to Defendants' motion for summary judgment.

United States District Court

For the Northern District of California

1    in the light most favorable to the party asserting the injury, did the prison official's conduct

2    violate a constitutional right?  <u>Id.</u> at 201.  If no constitutional right was violated if the facts were

3    as alleged, the inquiry ends and defendants prevail.  <u>See id.</u>  If, however, a constitutional

4    violation occurred, the second inquiry is whether the prison official could nevertheless have

5    reasonably but mistakenly believed that his or her conduct did not violate a clearly established

6    constitutional right.  <u>Id.</u> at 201-02.  "The relevant, dispositive inquiry in determining whether a

7    right is clearly established is whether it would be clear to a reasonable [prison official] that his

8    conduct was unlawful in the situation he confronted."  <u>Id.</u>

9          The first step under <u>Saucier</u> is to determine whether a constitutional violation was

10    alleged.  The Court previously determined that the allegations of the complaint stated a claim for

11    relief against Defendants for an Eighth Amendment violation.  (<u>See</u> March 12, 2003 Order at 6-

12    7.)  As a matter of <u>pleading</u>, Plaintiff's complaint sufficed to allege an Eighth Amendment claim

13    even if it would not suffice to <u>prove</u> such an injury.

14          Assuming arguendo that the allegations of the complaint were sufficient to state an Eighth

15    Amendment violation, the next step under <u>Saucier</u> is to consider whether the contours of the right

16    were clearly established.  533 U.S. at 201.  This is an inquiry that "must be undertaken in light of

17    the specific context of the case, not as a broad general proposition."  <u>Id.</u>  The law has been clearly

18    established that a prison official who knows that a prisoner faces a substantial risk of serious

19    harm from a delay or interference with the treatment of a medical condition may not delay or

20    interfere with that treatment.  <u>See McGuckin</u>, 974 F.2d at 1062; <u>Farmer</u>, 511 U.S. at 837.

21          The Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference

22    claim in <u>Estate of Ford v. Ramirez- Palmer</u>, 301 F.3d 1043, 1049-50 (9th Cir. 2002).  The court

23    explained that, for an Eighth Amendment violation based on a condition of confinement (such as

24    the safety risk in <u>Estate of Ford</u> or the health risk in Plaintiff's case), the prison official must

25    <u>subjectively</u> have a sufficiently culpable state of mind:

26              A prison official cannot be found liable under the Eighth Amendment for denying
              an inmate humane conditions of confinement unless the official knows of and

27             disregards an excessive risk to inmate health or safety; the official must both be
              aware of facts from which the inference could be drawn that a substantial risk of

28             serious harm exists, and he must also draw the inference.  Thus, a reasonable

**United States District Court**
For the Northern District of California

1
2
3

> prison official understanding that he cannot recklessly disregard a substantial risk
> of serious harm, could know all of the facts yet mistakenly, but reasonably,
> perceive that the exposure in any given situation was not that high.  In these
> circumstances, he would be entitled to qualified immunity.

4
5
6
7

Estate of Ford, 301 F.3d at 1050 (citation and internal quotation marks omitted).  In Estate of

Ford, the court explained that even though the general rule of deliberate indifference had been

expressed in Farmer, no authorities had "fleshed out 'at what point a risk . . . becomes sufficiently

substantial for Eighth Amendment purposes.'" Estate of Ford, 301 F.3d at 1051 (quoting Farmer,

511 U.S. at 834 n.3.).

8
9
10
11

> Thus, it would not be clear to a reasonable prison official when the risk of harm
> [due to conditions of confinement] changes from being a risk of *some* harm to a
> *substantial* risk of *serious* harm.  Farmer left that an open issue.  This necessarily
> informs "the dispositive question" of whether it would be clear to reasonable
> [prison officials] that their conduct was unlawful in the circumstances that [they]
> confronted.

12

Estate of Ford, 301 F.3d at 1051 (emphasis in original).

13
14
15
16
17
18
19
20
21
22
23
24

Plaintiff alleges that Defendants were responsible for the over six-month delay in his

receiving an orthopedic consultation, in violation of his Eighth Amendment rights.  Although the

law was clearly established that delay and interference with medical care can violate an inmate's

Eighth Amendment rights, the law does not specifically state the exact amount of delay that

would rise to the level of an Eighth Amendment violation.  After all, any gap in time of even a

few minutes or a few months between the authorization of the orthopedic consultation and the

actual orthopedic consultation technically is a delay, but that does not mean that every such

"delay" rises to the level of an Eighth Amendment violation.  And though it is not necessary to

find a case with the exact same fact pattern (e.g., six-month delay in receiving an orthopedic

consultation) to hold that Defendants breached a clearly established duty, more specificity as to

the amount of delay in receiving an orthopedic consultation must be shown, before the Court

could find that Defendants violated clearly established law.

25
26
27
28

Applying Estate of Ford here, it would not have been clear to a reasonable prison official

that a six-month delay in Plaintiff receiving an orthopedic consultation would expose Plaintiff to

a substantial risk of serious harm.  The circumstances in the instant case include a temporary

suspension of the Orthopedic Specialty Clinic, however, reasonable alternatives were available

for Plaintiff's routine medical care, including specialty medical care through the use of Telemedicine.  Therefore, a reasonable prison officer would not necessarily have drawn the inference that Plaintiff would not be able to receive adequate medical care with the aforementioned plan for emergency medical care that was implemented in place of the Orthopedic Specialty Clinic.

Because the law did not put Defendants on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  See Saucier, 533 U.S. at 202.  Defendants have met their burden of proof in the moving papers.  Meanwhile, Plaintiff did not introduce any evidence to show the existence of a genuine issue of material fact that it would have been clear to a reasonable prison official that a six-month delay in Plaintiff receiving an orthopedic consultation would expose him to a substantial risk of serious harm.  Therefore, Defendants are entitled to judgment as a matter of law based on their qualified immunity defense.

## CONCLUSION

In light of the foregoing, Defendants' motion for summary judgment is GRANTED.  The Court enters judgment in favor of Drs. Steinberg and Winslow.  The Clerk of the Court shall terminate any other pending motions and close the file.

IT IS SO ORDERED.


DATED: 9/26/05

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

United States District Court
For the Northern District of California